ALEJANDRO BONET MARTÍNEZ ET AL., Plaintiffs and Appellees, *v.* LAND AUTHORITY OF PUERTO RICO, Defendant and Appellant.

No. 516.    Decided May 31, 1963.

---

*Alejandro Romanace, José E. Franco Santiago, Osvaldo de la Cruz Vélez, Gustavo de Pedro,* and *Carlos Chavier Stevenson* for appellant. *G. R. Padró Díaz* for appellees.

Division composed of Mr. Chief Justice Negrón Fernández, Mr. Justice Blanco Lugo, and Mr. Justice Ramírez Bages.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

As part of the land reform launched in 1941, aimed principally at eradicating the evils of absenteeism and latifundia and underlying the fundamental declaration that the land of Puerto Rico is to be considered as a "source of life, dignity and freedom for the men and women who till it," the Legislative Assembly included in the Land Law, No. 26 of April 12, 1941 (Sess. Laws, p. 388), the novel proportional-profit farm program.[1] In the Statement of Motives of that Act it was said: "This fundamental public policy would not be complete if it were not accompanied by, as a corollary germane to its nature and scope, of the purpose of providing that in the case of land where, for natural or economic reasons, the division of the land is not advisable from a standpoint of efficiency, the greatest diffusion possible of the economic benefits of the land may still be effected, thereby contributing to raise substantially the standard of living of the greatest possible number of families. It is with a view to this phase of the legislative purpose that it is considered indispensable to make provision for the creation of proportional-profit farms through which the diffusion of the wealth

---

[1] The importance of this program for the implementation of the legislative land policy is not in question. "It is no overstatement to say that the key to the land policies of the Legislature of Puerto Rico is the proportional-profit farms. Upon the success or failure of these units the whole land program pivots." G. Concepción de Gracia, *The Land Authority of Puerto Rico*, 12 Geo. Wash. L. Rev. 302, 320–21 (1944).

According to information obtained from the brief for appellant, at present there are 63 proportional-profit farms with a total area of 28,989 cuerdas. Up to 1961 the sum of $7,292,417.98 had been distributed among the workers by way of profits and in addition to wages advanced in the sum of $97,416,978.13.

may be effected, to the point efficiency makes advisable, without the parceling of the land." (At 398.)

Title IV of the Land Law, which comprises §§ 64 to 73, 28 L.P.R.A. §§ 461–63 and 481–91, is devoted to the proportional-profit farms. It consists essentially of a program of utilization of farms in which what is divided is not the lands but the profits realized from their operation. In general terms, the Land Authority is authorized to lease parcels of 100 to 500 acres, and in the event a greater efficiency in the production so requires, parcels exceeding 500 acres, to farmers, agronomists and other persons with experience in agricultural management strictly selected on a merit basis.[2] The annual lease rental shall be sufficient to cover in 40 years the price paid for the farm by the Authority and the interest thereon computed on the outstanding balance at the beginning of each year;[3] however, the lessee shall not be liable personally for payment of the stipulated rental. The farms shall function in a subdivided number of administrative units which, in the judgment of the Authority, should be established for the purpose of a more efficient exploitation and a more equitable distribution of the profits returned by the enterprise, but if any administrative unit shall sustain losses, the latter shall be absorbed by the other units of the farm which may return profits. The wage or salary prevailing in the district or which may have been stipulated by the Commonwealth or federal laws or by collective agreement shall be guaranteed, by way of advances, to the laborers who work on the farms, *Tulier* v. *Land Authority*, 70 P.R.R. 249 (1949), and the manager shall be held personally responsible for any claim on the part of the laborers as a

---

[2] On the qualifications of the manager and selection system, see §§ 1 and 2 of the Regulations for Proportional-Profit Farms, approved by the Governor on November 15, 1944, as amended on December 3, 1948, 28 R.&R.P.R. §§ 461–1 and 461–2.

[3] Section 65(k), 28 L.P.R.A. § 463(k), and § 4 of the Regulations, 28 R.&R.P.R. § 461–4.

consequence of the violation of this provision,[4] and it is provided that every worker shall be entitled to receive, on a certain annual date or dates which may be stipulated, a share of the net income from the farm in proportion to the wages or salaries which he may have earned by way of advances for his work on such farm.[5] The distribution of the fruits from the land among those who cultivate and till it thus becomes a greater reality.

It is therefore of cardinal importance to describe the manner in which the net income from the farm is computed. Section 70 of the Act, 28 L.P.R.A. § 485, and § 23 of the Regulations, 28 R.&R.P.R. § 461–23, provide to that effect that it shall be made by crops and that the following charges shall be deducted from the gross income of each crop: (1) lease rentals; (2) taxes; (3) the wages or salaries received by the workers by way of advances; (4) expenses for materials and operation; (5) depreciation of current improvements approved by the Authority; (6) interest on sharecropping debt; (7) workmen's compensation quotas; (8) the percentage of the gross receipts determined by the Authority for supervision and auditing expenses and cooperative education (the Regulation provides 4 percent of the gross receipts for auditing expenses and cooperative education, but no mention is made of supervision expenses); (9) cost of the use of machinery, animals, agricultural implements and equipment; and lastly, (10) since the enactment of Act No. 3 of September 28, 1954 (Sp. Sess. Laws, p. 36), the premium determined by the Authority for crop-loan security to which reference is made in § 65(l), 28 L.P.R.A. (Supp. 1962) § 463(l).[6]

---

[4] Section 12 of the Regulations, 28 R.&R.P.R. § 461–12.

[5] *Cf.* with the term "sponsorship" used to describe the proportion existing between cooperatives and their members, § 2(g) of Act No. 291 of April 9, 1946, as amended, 5 L.P.R.A. § 882(g).

[6] "That the lessee shall pay to the Authority the premium that the Authority may determine to secure payment of any crop loan made to

The original text of § 70 of the Land Law included "the reserve fund determined by the Authority" among the charges to be deducted for the purpose of computing the net income of a proportional-profit farm (Laws 1941, at 388, 450). Act No. 197 of May 11, 1942 (Sess. Laws, pp. 996, 1012) added a provided clause to the effect that "whenever, in the opinion of the Land Authority, the reserve fund exceeds a prudent and necessary amount, the Authority may distribute such excess amount in the same proportion as other benefits are distributed under this Act." One year later, Act No. 50 of May 9, 1943 (Sess. Laws, p. 120), eliminated this reserve as a charge against the gross income and authorized the creation of the reserve fund out of the net profits of the farms. That is why § 24 of the Regulations, 28 R.&R.P.R. § 461–24, provided that "the net income of proportional-profit farms shall be distributed as follows: from 1 to 15 percent to the lessees as may be determined by the contract; the percentage that the Authority may deem reasonable to create a reserve fund; and the remainder to the laborers and employees of the farms in proportion to the salaries and wages earned by them in the crop of the year."

There is no provision in the Act or in the Regulations indicative of the purposes for which said reserve was created. However, when this reserve system was substituted in 1954 by the payment of a premium denominated for "agricultural purposes," the inference to be drawn is that the fundamental object of the reserve was to cover the losses which could be sustained in each proportional-profit farm. Up to that time the Authority absorbed the losses sustained in the operation of each farm, unless the farm had a sufficient amount credited to it as a reserve in prior years to cover such losses. It is well to clarify that this is a reserve in the auditing of each farm and not a reserve of funds for all the farms.

the Farm by the Authority, or by any public or private entity with the authority's surety, for agricultural purposes and the grinding of its canes."

In the course of the debate of H.B. 1260 which later became Act No. 3 of September 28, 1954, the majority floor leader, Senator Gutiérrez Franqui, pointed out that "The purpose of this amendment is that all, all the farms, those which realize profits as well as those which sustain losses, contribute to a common insurance fund against agricultural deficits, so that when making the annual liquidation the premiums paid by those which realized profits, plus the premiums paid by those which had deficits, may absorb the agricultural deficit of those having an unfavorable balance in their operations, aided by the premiums paid by those needing no aid because they had realized profits in their operations. It is correct, therefore, that this is an additional charge imposed on the farms, but the purpose is to absorb the losses of those having them and that such losses may not encumber the general fund of the Land Authority."[7] Throughout the entire debate the premium charge which was to substitute the reserve fund was characterized as "a program of insurance against agricultural losses."[8] And Senator Gutiérrez expressly added, contrasting the two systems, ". . . at present the farmer who realizes profits [he refers to the proportional-profit farm] is compelled by the Regulations and by the Act to contribute to a reserve fund, and that is a charge out of the money which is paid into that reserve fund; and, therefore, what this provision does is that, instead of paying it into the reserve fund where it remains idle, he will not incur any additional expense in next year's operation, but it is an auditing operation which, instead of entering that charge in a reserve fund where such charge remains idle until the day he sustains losses, and if it is the farmer described by the colleague who never has any, that is a reserve fund which keeps increasing and

---

[7] V Journal of Proceedings 252 (1954).

[8] *Id.* at 253 and 257.

remains idle in the books for any social purpose."[9] It may therefore be asserted that the purpose of the reserve authorized up to 1954 was to take care of any loss sustained in the operation of the farm and probably of other contingencies—such as wage claims—the existence of which is not known at the end of each crop season. This is fully corroborated by Mr. Colón Torres, Secretary of Agriculture at that time, in a memorandum which he sent on April 9, 1954 to the Governor of Puerto Rico explaining the extent of the bill:

". . . Since the Land Authority commenced its Proportional-Profit Farms program, the farms which have sustained losses have accumulated a deficit of $1,605,707. This deficit represents a loss to the Authority for the reasons already mentioned. It is true that the farms which have been successful in their operations have accumulated a reserve in the sum of $1,768,261. However, it is also true that the existing provisions of the Land Law relative to the accumulation of a reserve fund do not authorize the use of these funds to absorb the losses of farms which have not accumulated any reserve. It is our opinion that the adoption of some measure which will guarantee that the Authority will not sustain losses as a result of having provided agricultural financing, or having secured the agricultural financing given to a proportional-profit farm which has not been successful in its agricultural operations, should not be put off any longer."

The farm known as "Pajuil," situated in the wards of Hato Arriba and Campo Alegre of Hatillo and Campo Alegre of Arecibo, was organized in 1944 as a proportional-profit farm for the cultivation of sugarcane and continued to operate as such until 1955, when the cultivation of sugarcane was discontinued and it was devoted to the pineapple program. According to information appearing from the answer to an interrogatory, the annual profits of that farm

[9] *Id.* at 254.

which "were covered" into the reserve fund[10] amounted to the sum of $40,543 up to 1954, as shown below:

| | |
|---|---|
| 1944 | $ 1,935.04 |
| 1945 | 1,584.31 |
| 1946 | 11,885.65 |
| 1947 | 1,646.64 |
| 1948 | 2,377.02 |
| 1949 | 10,543.04 |
| 1950 | 4,035.27 |
| 1951 | 2,856.54 |
| 1952 | 460.71 |
| 1953 | 2,036.55 |
| 1954 | 1,182.23 |

On December 8, 1958, Alejandro Bonet, manager of Pajuil farm, 157 laborers and the beneficiaries of nine deceased workers[11] filed a civil action against the Land Authority and Pajuil Proportional-Profit Farm claiming the amounts corresponding to them, respectively, in the aforesaid reserve. At a hearing held the parties stipulated the following additional facts: that Pajuil farm is devoted temporarily to the planting of pineapples and may be "reactivated" in the future as a proportional-profit farm, and that the reserve funds belong to the laborers who worked on the farm from 1944 to 1955. The Authority's theory is that, even admitting that the reserve fund belongs to the workers and notwithstanding it

---

[10] In the management contract executed by the Authority and Manager Alejandro Bonet it was agreed that "The Farm shall set apart from the net income, as provided in the Thirty-seventh clause, the percentage which the Authority may deem prudent and reasonable to create *the reserve for contingencies* of the Farm. The Manager shall have no right in the reserve for contingencies thus created."

[11] Section 72-A, added by Act No. 108 of May 7, 1948 (Sess. Laws, p. 256), 28 L.P.R.A. § 488, provides for the designation of beneficiaries in the event of death or disability of the laborers, in order that such beneficiaries may receive the amounts which may be owing to the laborer by reason of salaries or wages earned, by way of advances for his work, subsidies, *undistributed profits,* or payment of any differential.

was subsequently substituted by the agricultural security system by the payment of an annual premium, it is not bound to return the same since it is not required by any legal provision to do so, and that, therefore, it is incumbent on the agency to determine in its discretion the time for delivery of the funds.

After delivering a well-reasoned opinion, the trial court rendered judgment ordering the Land Authority to liquidate, distribute and deliver to plaintiffs the share corresponding to them in the reserve fund of Pajuil farm pursuant to the Land Law. We agreed to review said judgment. Appellant assigns three errors: (1) that the judgment constitutes an undue interference with the judicial power, since it was not the legislative intention in enacting Act No. 3 *supra* of September 28, 1954 to distribute the reserve funds of the proportional-profit farms; (2) closely related with the previous error, that respondent court erred in interpreting the Act to the effect that it expressly authorized the distribution of the funds accumulated up to its enactment; and (3) that the determination that reserve funds are unnecessary is likewise erroneous. Because of their relation to each other, the errors must be discussed jointly.

It is no easy task to dispose of this matter since the theories of both parties are admissible within a strict hermeneutic process, depending on the rule of construction which may be definitively selected as the proper and applicable rule. Nor is the road any smoother when there is involved, on the one hand, an agency charged with the administration of a public policy aimed at accomplishing a greater social utility, and, on the other hand, a group of workers who claim part of the fruits realized as a result of the success of that land revendication program. However, in this equation there are two known factors of controlling importance: (1) the attribution of the fund to the laborers, and (2) the purpose underlying the creation of the reserve.

■ Regarding the nature of the fund, it is highly significant that originally the reserve constituted an expense to be deducted from the gross receipts of the farm, such as the lease rentals and the property taxes. Two years later it ceased to be a simple operating expense and it is deducted from the net profits which by provision of law must be distributed annually among the workers in proportion to the wages or salaries earned by them by way of advances. This indicates a clear legislative purpose—in consonance with the public policy that the fruits of the land belong to those who till it— that these funds belong to the laborers and are subject to distribution whenever the need which called for their separation disappears. This accounts for the provision introduced by Act No. 197 *supra* of May 11, 1942 which was preserved until 1954, to the effect that "whenever, in the opinion of the Land Authority, the reserve fund exceeds a prudent and necessary amount, the Authority may distribute such excess amount in the same proportion as other benefits are distributed under this Act."[12] That is why at the time of selling one of the proportional-profit farms, the Reparada farm, the Authority distributed among the laborers the reserve fund accumulated in the operation of that farm.

■■ Nor is there the slightest doubt that the purpose of creating the reserve fund was to take care of the contingencies which could arise in the agricultural operation of the farms and, specifically, the losses in a particular crop. In this connection it must be recalled that § 73 of the Act, 28 L.P.R.A. § 491, instructs the Authority to make prevailing the purpose that the management of these farms be as

---

[12] In the course of the debate on H.B. 1260, Senator Dávila Díaz, Chairman of the Senate Committee on Agriculture, said in referring to the reserve funds: "Those reserve funds belong to the farm. Whenever they are going to be distributed, they must be distributed among those laborers *because they belong to them.*" V Journal of Proceedings 262 (1954).

similar as possible to the management of private farms in reference to the distribution of profits. It is unquestionable that in private business these reserve funds are created to meet any contingency which may arise as a result of losses sustained in succeeding years. Furthermore, as already stated, the agency absorbed the annual losses of each farm in particular and it foreseeably sought to protect itself against this contingency by means of the reserve. However, in practice the precautionary measure was not as satisfactory as was expected, since apparently the reserve accumulated in connection with farms which generally did not sustain losses, while those with an unfavorable operation did not have an accumulated fund to cover the losses sustained. It was precisely for this reason that the system was substituted by the payment of a crop insurance quota which is paid by the farms which return profits as well as by those which sustain losses, and which quota is computed on the amount of the crop.[13]

█ The Pajuil farm has been inactive in the proportional-profit farms program for nine years. At the termination of its sugar planting operations the reserve amounted to $40,543. It did not sustain losses during its operation, since, as it appears hereinabove, the reserve fund kept increasing from 1944 until 1954 by amounts which were deducted from the net profits realized and which ranged between $11,885.65 in the year in which the profits were greater and $460.71 in the year in which the yield was lower. It was not alleged that there existed any contingency pending determination. It is not likely that wage claims may be made at this time, in the absence of interruption of the prescriptive period, since the work ceased since 1955. At any rate, should there be some contingency to bar disposition of the fund, it

---

[13] According to unofficial information obtained, the premium charged is .0262 percent on the monthly balance of each farm's current account.

was incumbent on appellant to raise the question as defense.[14] On the other hand, the reserve fund is unnecessary since the crop security system was established. In the aforementioned memorandum the Secretary of Agriculture informs the Governor that "Once this new crop security system is established, it will be unnecessary to continue in force the existing provisions of § 70 of the Land Law relative to the accumulation of funds for reserve purposes, since in such case the Authority will be in a position to absorb any loss sustained by a farm, and, consequently, the farms will no longer need to accumulate any reserve." The following statement was made by the Chairman of the Senate Committee on Agriculture in the course of the debate on the measure: "In that case, from now on, after this bill is passed, since the crop is secured, there will be no need for a reserve fund."[15]

■  It is therefore crystal clear that according to the stipulation and the foregoing statements (a) the reserve fund of Pajuil farm belongs to the workers; (b) at present there are no claims against the fund; and (c) in the event the farm is reactivated within the proportional-profit farms program, the reserve would be unnecessary. This leads inevitably to the conclusion that the balance existing in that fund ought to be distributed among the workers.

■  The second aspect in this appeal concerns the term for returning to the beneficiaries their share in the reserve

---

[14] Nor was any defense raised invoking the provisions of § 72-C added to the Land Law by Act No. 120 of April 27, 1949, as amended by Act No. 131 of June 27, 1958, 28 L.P.R.A. (Supp. 1962) § 490, which provides that: "Any action against the Land Authority and/or its subsidiary corporations and/or a proportional-profit farm by workmen or laborers to recover proportional profits, shall prescribe after the lapse of three years. The time for the prescription of such actions shall be counted from the day said profits are declared by the Board and published in two newspapers of general circulation in Puerto Rico."

Whether this provision is applicable to actions claiming profits deducted to be covered into a reserve fund, *quaere.*

[15] V Journal of Proceedings 258 (1954).

fund. There is no provision in the Act, express or implied, covering this situation. The Authority places particular emphasis on certain statements made by Senator Susoni in the course of the debate to support its theory that it can retain the funds until such time as in its discretion it may be convenient and advisable. Referring to the reserve funds, said the lawmaker: "It is a question of accounting. The Land Authority does the accounting by farms, but the Act determines it *by funds of the Authority*. The manner in which the Authority makes the determination is a different thing, and I agree with my colleague; if it says so, it is so; however, the fact that the Authority keeps the accounting by farms does not authorize it *to refund the amounts accumulated for those accounts* at the expiration of the lease contract."[16] However, this statement cannot be considered isolatedly because it is based on the opinion that the reserve fund belongs to the Authority and not to the workers, as was admitted in the present action. Precisely, shortly before Senator Susoni said "There is nothing else pending because the law does not prescribe in any provision that the funds so accumulated be refunded at the expiration of the lease contract, *because they form part of a fund of the Authority; they do not belong to the proportional-profit farm.*"[17]

Since the fund was created by express authorization of the Legislative Assembly, it is natural that the term for distribution thereof among the workers, as of the date the operation of the farm within the proportional-profit program is discontinued, should have been fixed by law. But apparently this problem was not foreseen in the course of the drafting, debate and approval of the measure which definitively had the effect of discontinuing the accumulation of the reserve. This does not mean that in the absence of legislative

---

[16] *Id.* at 263.
[17] *Id.* at 262.

action the courts are incompetent to act, since compliance with the obligation, which in this case arises from the Act itself, cannot be left to the exclusive discretion of the party obligated, and it is their duty, considering all the circumstances, to fix such period as may be deemed reasonable. The trial court stated that "six years is more than reasonable . . . to comply with the obligation contracted"; however, in that connection it did not hear any evidence on the different factors which may have a bearing for the purpose of making the proper determination. The immediate availability of the funds,[18] the time taken to prepare the declaration of beneficiaries and the determination of the profits corresponding proportionally to each, the prosecution of the cases in which the beneficiaries are dead or incapacitated, and others which at this time may escape us, are circumstances to be considered for the purpose of fixing a term which, bearing in mind that there are involved amounts to which humble laborers who till the soil are entitled, should not prove detrimental to the public program which the Land Authority of Puerto Rico is carrying out.

The judgment rendered by the Superior Court, Arecibo Part, on April 28, 1961 will be set aside and the case remanded to the trial court for the holding of a new trial and the hearing of evidence on the reasonable period to be fixed for the purpose of refunding the reserve fund to plaintiffs-appellees.

The Chief Justice Mr. Negrón Fernández, although agreeing with the pronouncements of this opinion, dissents as to the disposal of the case because he believes that the judgment should be affirmed.

---

[18] The Authority has been wisely using the funds for the purpose of financing the same proportional-profit farms, thereby preventing in all likelihood greater charges of interest and the payment of a higher quota within the financing security program. (V Journal of Proceedings 262 (1954) and p. 17 of the brief for appellant.)

In appellant's supplemental brief it is alleged that the reserve fund belongs to the Authority and not to the workers. We cannot agree with

this theory for the reasons stated in the course of this opinion, and
further, because appellant had expressly admitted before the trial court
and up to this time that the fund belonged to the workers of Pajuil farm.
Its unwavering conduct respecting the reserves also confirms it.